## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| HOWARD THOMPSON and | : | |
| DEBORAH THOMPSON, h/w | : | |
| | : | |
| Plaintiffs, | : | **Hon. Joseph H. Rodriguez** |
| | : | |
| v. | : | Civil Action No. 14-2397 |
| | : | |
| HARRAH'S ATLANTIC CITY | : | |
| HOLDING, INC., et. al. | : | |
| | : | **Opinion** |
| Defendants. | : | |
| | : | |

These matters arise out of an incident that occurred on May 30, 2012, at Harrah's Casino in Atlantic City. Plaintiff claims that he suffered extensive burns to his feet while walking across the outside pool deck. He filed a three-count complaint against several defendants alleging violations of New Jersey's Product Liability Act, N.J. Stat. Ann. § 2A:58C-1, negligence, and his wife's loss of consortium.  Generally, he alleges that defendants designed, manufactured, assembled, processed, distributed, reconditioned, maintained, services, installed, inspected and made available for use and/or advertise the pool and sundeck in question, and/or more of its component parts, which are hereinafter referred to as "the product" or "the pavers" which were ultimately sold or leased to the hotel defendants and/or one or more of defendant John Doe Corporations, and which ultimately caused the Plaintiffs' injuries and damages.[1]

---

1.  The Thompsons were on the sundeck at Harrah's between 10:30 a.m. and 2:00 p.m. Deborah Thompson Dep., Ex. J., 13:4-8. Howard Thompson did not feel any burning or injury at the time he was enjoying the sundeck and he did not experience any immediate blistering, bleeding, fluid or weeping. Howard noticed a small red spot a few days after his visit to Harrah's and a blister formed. Howard Thompson Dep., Ex. C., 82:25, 83:1-8. Deborah Thompson began to treat Howard's burn with a topical ointment, but the redness and pain did not abate. But Howard continued to work; he was a booter for the Philadelphia Parking Authority.  Then, on or about June 2nd

On April 27, 2017, the Court granted summary judgment in favor of Defendant Roofblok.  Presently before the Court are several independent motions for summary judgment filed by the remaining defendants: Associated Indemnity Insurance Company, Thomas Company, Inc., Oldcastle, Inc., T.N. Ward Company, Harrah's Atlantic City Operating Company, and Friedmutter Group, LLC.

Associated Indemnity Insurance Company provided insurance coverage for defendant T.N. Ward, which is seeking indemnification.  T.N. Ward, the general contractor on the project, moves for summary judgment because it is not the designer or manufacturer of the product and it received no warnings as to the product's fitness for the application, it is, therefore, not liable under a negligence or product's liability theory. Thomas Company, Inc., installed the original pavers and moves for summary judgment because there is no allegation that the pavers were incorrectly installed. Some of the pavers were replaced over time and Thomas Company, Inc. did not do the replacement installation.  Plaintiff is unable to state whether his injury occurred on a replacement tile or on an original tile.  Oldcastle, Inc., also known as Westile, manufactured the original tiles at issue and supplied them to a distributor, who eventually sent them to the Harrah's project.  Westile moves for summary judgment because there is no evidence of a defect in the tiles and because Plaintiff is unable to state whether his injury occurred on a replacement tile or on an original tile.  Harrah's Atlantic City Operating Company moves for summary judgment as to the product's liability claims because it is not a

---

or 3rd, 2012, the blister on Howard's foot began to leak clear fluid and the pain markedly increased. The Thompsons went to the Emergency Room and Howard recounted his visit to the sun deck at Harrah's in response to the doctors' inquiries.  Howard was treated for a third degree burn, but complications arose and ultimately Howard endured 3 surgical procedures and several infections.  Howard injuries eventually required an amputation of three toes on his foot, and then a trans-metatarsal amputation of a majority of his left foot. Id.

manufacturer or designer of the paver and is therefore not amendable to suit on this basis.  Likewise, as to the negligence claim, Harrah's argues that because there was no notice that there was a problem with the pool deck, it is not liable for Mr. Thompson's injury.  Finally, the Friedmutter Group, LLC is the architect of the pool deck seeks summary judgment because Plaintiff failed to get an affidavit of merit in support of its claim of professional negligence, as required by New Jersey's Affidavit of Merit Statute, 2A:53A-27.  Friedmutter claims that allegations of professional malpractice against an architect are subject to the Affidavit of Merit Statute.

The Court has considered the written submissions of the parties and the arguments advanced at the hearing on September 26, 2017. For the reasons stated on the record during the hearing, and those that follow, summary judgment is granted in favor of all defendants as to the product liability claims and denied as to the negligence claims against Defendant Harrah's.

## I.   **Standard of Review**

A court will grant a motion for summary judgment if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law.  Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (c).  Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Andersen, 477 U.S. at 256-57.  Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 322.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  Credibility determinations are the province of the finder of fact.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## II.  **Analysis**

Summary judgment is granted as to the product liability claims because Plaintiff's expert is unqualified to render an opinion on defectiveness and because there is no evidence in the record to demonstrate that the pavers were defective. In addition, summary judgment is granted as to the claims against Friedmutter because Plaintiff failed to file an affidavit of merit pursuant to N.J.S.A. 2A:53A-27 and because, even if that failure is not fatal, Plaintiff's expert is unqualified to opine on matters related to architecture. Finally, as to Plaintiff's claims of negligence, summary judgment is denied as to Defendant Harrah's.

### A.  Product's Liability Claims

To establish a right to relief under New Jersey's Product Liability Act ("PLA"), "a plaintiff must show that the defendant manufactured the product, that a reasonably foreseeable user was injured, that the product was defective, that the defect existed when it left the defendant's control, and that the defect was the actual and proximate cause of the plaintiff's injury." Worrell v. Elliott & Frantz, 799 F. Supp. 2d 343, 350 (D.N.J. 2011) (citing Myrlak v. Port Auth. of N.Y. and N.J., 723 A.2d 45, 52 (N.J. 1999)). Summary judgment is granted as to the product's liability claims because Plaintiff's expert cannot establish that the pavers were defective and or that the architect deviated from the requisite standard of care.

### 1.  Affidavit of Merit Statute, N.J.S.A. 2A:53A-27

Summary Judgment is granted as to Defendant Friedmutter because Plaintiff failed to timely file an Affidavit of Merit pursuant to N.J.S.A. 2A:53A-27. Mr. Meshulam

testified that he is not a licensed engineer and that he has never applied with any state to become a licensed engineer. Meschulam Dep., 12:22-13:8. Friedmutter is a professional architecture firm.  Plaintiff's claims against Friedmutter include, *interalia*, that "the floor of the sundeck was inadequate, improper and/or not in accordance with the applicable laws, regulations, and codes and that Friedmutter negligently used materials for the flooring of the sundeck that become excessively hot in the sun, otherwise, causing a hazardous condition for persons walking barefoot on the sundeck.  The claims against Friedmutter require an Affidavit of Merit ("AOM") pursuant to N.J.S.A. 2A:53A-27.

The AOM statute provides:

> In any action for damages for personal injuries [or] wrongful death ... resulting from an alleged act of malpractice or negligence by a licensed person in his profession or occupation, the plaintiff shall, within 60 days following the date of filing of the answer to the complaint by the defendant provide each defendant with an affidavit of an appropriate licensed person that there exists a reasonable probability that the care, skill or knowledge exercised in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional or occupational standards or treatment practices. The court may grant no more than one additional period, not to exceed 60 days, to file the affidavit pursuant to this section, upon a finding of good cause.

N.J.S.A. 2A:53A–27.

The Affidavit of Merit Statute imposes a strict deadline by when the plaintiff must serve an Affidavit of Merit: within sixty (60) days of the professional defendants filed answer. N.J.S.A. 2A:53A-27; see also Janelli v. Kepper, 317 N. J. Super. 309, 312 (Law Div. 1998). A plaintiff may apply for an extension, however the Affidavit of Merit may not be served more than 120 days after the Answer has been filed. Id.  In other words, an extension renders a 120–day deadline from the filing of the relevant answer (the original

60 day period, plus an additional sought-and-granted-for-good-cause period not exceeding 60 days) an "end of the line ... drop-dead date[.]" Douglass v. Obade, 359 N.J. Super. 159, 160 (App. Div. 2003); Familia v. Univ. Hosp., 350 N.J. Super. 563, 569 (App. Div. 2002) (an extension acts as "an outer time limit ... beyond which no extension could be granted[.]")

The failure of a plaintiff to produce an Affidavit of Merit within this timeframe is considered a failure to state a cause of action requiring the dismissal of the complaint with prejudice N.J.S.A. 2A:53A-29; see also Nuveen Mun. Trust v. Withumsmith Brown, P.C., 692 F.3d 283, 305; see also Cornblatt v. Barow, 153 N.J. 218 (1998).

Here, Plaintiffs failed to serve the Affidavit of Merit within the prescribed timeframe and never sought an extension from the Court. Plaintiffs did submit a "sworn statement" in lieu of the Affidavit of Merit; however, the filing was made outside the permissible window. N.J.S.A. 2A:53A-29; see also Nuveen Mun. Trust, 692 F.3d at 305; see also Cornblatt, 153 N.J. 218 (1998).

The Court will now consider whether an AOM is required under the circumstances here. In order to assist courts in determining whether an affidavit of merit is required, the Couri Court articulated a three-element test. Courts should ask:

> (1) whether the action is for "damages for personal injuries, wrongful death or property damage" (nature of injury); (2) whether the action is for "malpractice or negligence" (cause of action); and (3) whether the "care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint [ ] fell outside acceptable professional or occupational standards or treatment practices" (standard of care).

Id. at 1137 (quoting N.J.S.A. § 2A:53A–27). If all three elements are satisfied, then the claim falls within the purview of the AMS, and the affidavit is required. Calender v.

NVR, Inc., No. 10-CV-4277 NLH KMW, 2011 WL 4593759, at *4 (D.N.J. Sept. 30, 2011), aff'd, 548 F. App'x 761 (3d Cir. 2013)

All three Couri elements are satisfied. First, as an architect group, defendant Friedmutter is considered a "licensed person." Second, the claim seeks damages for personal injury. Third, the nature of the claim necessarily involves a contention about the professional standard of care for a protected, licensed class—architect.[2] The Affidavit of Merit statute applies to the Plaintiff's design defect claim.  An affidavit of merit was therefore required to proceed under that theory of liability. It is undisputed, however, that Plaintiff did not file an affidavit of merit.[3]

Plaintiff argues that the reason an AOM was not filed was the result of Friedmutter's alleged failure to supply documents requested by Plaintiff.  Friedmutter argues that it

---

[2] In deposition, Mr. Meshulam was unable to provide an expert opinion setting forth Friedmutter's alleged deviation from the standard of care.

      Q: ...How did the Friedmutter Group deviate from the accepted standards of care for architectural practice with respect to your opinion there in No. 10?
      A: Well, it appears that that was not: taken into account
      Q: What's the standard, sir? What's the architectural standard of care for what needs to be taken into account?
      A: The usage of the materials in the building.
      Q: And what's the source of that information?
      A: My experience working with architects.
      Q: I want to know what the basis of your opinion is that they should have considered these materials and how the standard of care requires that?
      A: Okay. I'm not going to be able to sit today and quote you from a book that says Standard of Care on it.

Meshulam Dep., Ex. 6, 188:17-189:15.

[3] The relevant procedural history is as follows. At the time of the filing of the original complaint, no Affidavit of Merit was produced.  The Complaint was amended several times as follows. Plaintiff filed a Third Amended Complaint [Dkt. No. 38] on January 30, 2015 and Defendant Friedmutter filed an Answer [Dkt. No. 50] on April 9, 2015. An Affidavit of Merit, with an extension of time, would have been due in June 2015.  Plaintiff failed to file any document purporting to satisfy the AOM statute at this time or in August 2015, when, in the event a second extension was given, the AOM would have been due. The parties engaged in motion practice, including a motion by Friedmutter to dismiss on the basis of the lack of an AOM pursuant to N.J.S.A. 2A:53A- 27. On September 29, 2015, Plaintiff filed an Affidavit in Lieu of an Affidavit of Merit pursuant to N.J.S.A. 2A:53A. See Waldron Cert., Ex. G.  The motion to dismiss was denied as moot because Plaintiff filed a Fourth Amended Complaint [Dkt. No. 96] on February 10, 2016. Friedmutter filed its Answer [Dkt. No. 122] on July 1, 2016.  Plaintiff never filed an AOM or requested an extension during this period of time.

supplied all of the documents in its possession and that Super Storm Sandy impeded its ability to produce more documentation; however, the documents Plaintiff requested were in the possession of other named defendants. See Waldron Cert., Ex. G. The documents Plaintiff requested included architectural drawings, plans and specifications, allegedly necessary for obtaining an AOM. Id.; Ex. H. Friedmutter maintains that Affidavit in Lieu is insufficient because Plaintiff is attempting to bypass the Affidavit of Merit Statute by claiming it has not received certain documents from Friedmutter, documents which are available from Atlantic City Township and Defendant Harrah's. Plaintiffs' claims in this regard, that they have not received crucial documents from Friedmutter, is unavailing and there is no evidence tending to show that Friedmutter is in possession of the requested documents. The failure to file an affidavit of merit results in dismissal with prejudice of the claim. Cornblatt, 708 A.2d at 413; see also Calender v. NVR, Inc., No. 10-CV-4277 NLH KMW, 2011 WL 4593759, at *8 (D.N.J. Sept. 30, 2011), aff'd, 548 F. App'x 761 (3d Cir. 2013).[4]

   2. Federal Rule of Evidence 702 and Daubert

   The guiding principles that inform the Court's judgment are found in Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or

---

[4] In addition, Mr. Meshulam is not qualified to opine on an architecture design. His expertise is generalized construction. There is no indication that Plaintiff is offering Mr. Meshalum as a construction expert as relates to Friedmutter. To the extent Plaintiffs claim that Mr. Meshalum is qualified to render an expert opinion as to the Friedmutter, the expert report is devoid of any methodology or inspections performed by Mr. Meshalum that are widely accepted within the architectural community. In addition, Mr. Meshulam did not review the architectural design of the building, has never reviewed the specifications of the building in question, and has no knowledge of the appropriate standard of care in the State of New Jersey. As a result, he is not qualified to render an opinion as to the architectural implications of Plaintiff's injury. See Fed. R. Evid. 702.

> education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Consistent with that Rule, Daubert established a "trilogy of restrictions" on the admissibility of expert testimony relating to scientific knowledge. See Calhoun v. Yamaha Motor Corp., 350 F.3d 316, 321 (3d Cir. 2003). This "trilogy" consists of "qualification, reliability and fit." Id. The Third Circuit liberally construes the qualifications of an expert, noting that "a broad range of knowledge, skills, and training will qualify a witness as an expert ..." See Yarchak v. Trek Bicycle Corp., 208 F.Supp.2d 470, 495 (D.N.J. 2002) (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994) ("Paoli II" )) (internal quotations omitted).

With respect to reliability, the focus is on the "principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595. Four benchmarks help determine whether a theory or technique qualifies as "scientific knowledge" such that it will assist the trier of fact. See Daubert, 509 U.S. at 593. The Court considers: (1) whether the theory can be or has been tested; (2) whether the theory or technique has been subjected to peer review and/or publication; (3) the rate of error; and (4) whether the theory or technique has been generally accepted within the putative expert's respective community. Id. at 593–94. The Third Circuit adds other factors, including: (5) the existence and maintenance of standards controlling the technique's operation; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert testifying based on the methodology; and (8) the non judicial uses to which the method has been put. Paoli II, 35 F.3d at 742 n. 8. When considering these factors, the Court's inquiry must be a "flexible one." Id.

As for the third prong, Rule 702 requires that the "proffered expert testimony must 'fit' within the facts of the case." Yarchak, at 208 F.Supp.2d at 496. The fit requirement mandates that the testimony "in fact assist the jury, by providing it with relevant information, necessary for a reasoned decision of the case." Id. (citing Magistrini v. One Hour Martinizing Dry Cleaning, 180 F.Supp.2d 584, 595 (D.N.J. 2002)). Thus, even if an expert is qualified and relies on sound methodology, he must still "apply this expertise to the matter at hand." See Calhoun, 350 F.3d at 324. These factors are not exclusive. They "are intended to serve only as 'useful guideposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted.'" Yarchak, 208 F.Supp.2d at 495 (quoting Heller v. Shaw Industries, Inc., 167 F.3d 146, 152 (3d Cir. 1999)). With the help of these guideposts, the Court performs its essential gatekeeper role under Federal Rules of Evidence 702.

The Court will first address the defendants' collective claim that Plaintiff's expert fails to offer any scientific explanation or methodology for his conclusions, and, therefore, comprise an impermissible net opinion, falling short of the standards set forth in Daubert.

Setting aside, Mr. Meshulam's qualifications as a generalized construction project worker, the Court finds that the lack of methodology is fatal to the admissibility of his opinion on the product liability claims and professional negligence claim against Friedmutter. Mr. Meshulam does not hold any specialized licenses or degrees; rather, he has a long career, which spans over thirty six years, in the construction industry which has afforded him the opportunity to work alongside engineers and architects. His experience, as explained by Plaintiff, provides him with practical qualifications related to the architectural testing of products using a hands-on approach to the test the

11

performance, functionality, and suitability of products integrated into a building

scheme.  Mr. Meshulam's report, as he explained in deposition, concludes that the usage

of the pavers, as integrated into the design of the pool deck was defective. Meshulam

Dep., p. 200:3-20.  In this regard, Mr. Meshulam agrees that the pavers themselves are

not defective.  There is no competent evidence in the record to demonstrate that any

pavers manufactured by Westile were defective when they left Westile's manufacturing

plant.

The outdoor pool deck at Harrah's was constructed in 2007 with concrete pavers

installed by defendant Thomas Company, Inc. According to Thomas, the manufacturer

of the installed concrete pavers was Westile. See M. Thomas Dep. at 15-16. Thomas

completed the original installation of the concrete pavers at Harrah's in April of 2007.

Thomas subsequently sold replacement pavers to Harrah's in 2011 and 2013.  According

to Michael Thomas, Harrah's would call from time to time to obtain replacement pavers

to replace broken ones.

Mr. Meshulam conducted a physical evaluation of the pool deck on a day with

similar weather conditions as those present on Harrah's pool deck on May 30, 2012.

Mr. Meshulam used a temperature gage to measure the heat of the tile in the area

Plaintiff claims he was injured.[5] According to his reading using an infrared camera, the

tile attained a temperature of 137.7 degrees.  There is no dispute that this temperature

could cause injury, but there is a dispute as to the actual temperature and whether

---

[5] Plaintiff did not immediately recognize his injury because his diabetic condition diminishes his ability to feel pain. A few days after his visit to Harrah's he went to a doctor to investigate a red, painful mark on the bottom of his foot. As previously discussed, during his discussion with doctors about how and where his foot may have become burned, he came to equate the genesis of the injury with his time at Harrah's.

Meshulam's readings can be attributed to the conditions that existed on the day of Thompson's injury.

Mr. Meshulam could not be certain whether the tile that injured Plaintiff was a replacement tile, or an original tile from Westile. In order to assure himself of the circumstances, he relied on the testimony of Plaintiff.  Because Plaintiff did not file a complaint with Harrah's that the time of the alleged injury, ostensibly because he did not recognize that he had been injured, Plaintiff's own testimony provides the only clues to area on the pool deck where the injury may have occurred.

Mr. Meshulam opines that the configuration of the pool deck as being bordered on the East by the Bay View Tower with a 200' wide by 237' tall glass wall, with highly reflective windows.  Meshulam Rep., Ex. P.  Between the East tower and the pool deck is a swimming pool covered by the glass and steel skylight structure, which also incorporates reflective glass windows. Id.  According to Mr. Meshulam, the position of the sun at the time Plaintiffs used the pool deck caused the "sunlight [to] reflect from all exposed glass surfaces like an infinite number of bouncing balls, from glass to deck or from glass to glass to deck." Id.  The reflection caused an effect similar to a laser to heat the pavers in a manner that caused them to accumulate more heat than that could be achieved from normal sun exposure. Id.  Mr. Meshulam used Google Earth to construct the configurations of the distance between the glass structures and the area traversed by Plaintiffs. Id.  Based on those measurements and the arc of the sun during early afternoon, he created a diagram to show the path of the deflected sunlight onto the deck below. Id.  Based on these calculations, he posits that a "deathray" caused the pavers to superheat and injure Plaintiff. Id.

Mr. Meshulam agrees that he does not have the expertise to opine on matters of architecture and states that his knowledge is based on the fact that others may have experienced deflected heat as a result of architectural design.

> Q: So you said, "Reasonable care requires that one take into account the sun's position." Is there any published standard that sets that forth?
>
> A: Well, I showed you some articles where people have experienced difficulties because of the sun's reflection on reflective glass, and there are more such things.
>
> Q: Okay. The published articles we talked about before, but are you aware of any published standards, such as ASTM standards, that require an architect to take into account the sun's position?
>
> A: ASTM is a testing method, so I don't know if it would be in their domain.
>
> Q: Are you aware of any standards?
>
> A: Sitting here today, I cannot think of standards that are out there for that.

Meshulam Dep. at 158:20-159 25

Mr. Meshulam also agrees that he is and was not aware of any standards or codes requiring an architect and/or design professional to consider surrounding reflective surfaces and the anticipated use of the floor surface in the preparation of construction documents.

> Q: Okay. Now, look at No. 11, with regards to exterior walking surfaces and the design and selection of materials for those surf aces, in a construction project such as the one at Harrah's, who is generally responsible for the design and selection of materials?
>
> A: Generally it's the architect, but if you have a general contractor, sometimes they can influence that decision and you can also have the owner influencing the decision.
>
> Q: Is there any code that requires a design professional such as an architect or contractor or the property owner to take into account surrounding reflective materials when selecting materials for an exterior walking surface?
>
> A: Not that I'm aware of, but that doesn't relieve them of their professional responsibility to look at the project in its entirety and to make judgments that are specific to that project.

14

Q: Again, is there a published standard that requires an architect, contractor, property owner to take into account surrounding reflective surf aces when installing exterior walking surfaces?

A: I'm not aware of it.

Q: As we sit here today, do you have an understanding of what the standard of care is for an architect in the State of New Jersey?

A: Specifically in the State of New Jersey, no.

Id. at 161:24-l62:7; 184: 11-184:19.

To support his conclusions, Mr. Meshulam highlights an online article, dated June 30, 2016, in which a casino patron, in 2010, posted on Instagram that the pool deck was 107.6 degrees. Id.  In addition, Meshulam's Report includes an excerpt from the National Association of Home Builders article titled "Sunlight Reflected from Double-Paned Low-E Windows, and Damage to Vinyl Siding and other Materials."  The article explains the phenomenon of light and heat transferring from reflective glass onto surrounding objects, and includes a 2013 photograph of onlookers watching an egg fry from the heat of reflected sunlight.  Id. A diagram shows how a "skyscraper can turn the sun into a 'deathray'." Meshulam also references a government website that explains how reflective glass reflects solar heat.  Id. Based on the forgoing, Mr. Meshulam opines that Harrah's should have known about the dangerous condition on its pool deck and offers several solutions for improvement.

Mr. Meshulam's opinion does not allege that the tiles were improperly installed or that they were manufactured incorrectly. Even under the liberal standards governing a proposed expert's qualifications, Mr. Meshulam lacks the requisite qualifications to opine on the component parts of the pavers and/or the design or formulas used to manufacture the pavers. In short, he lacks the "broad range of knowledge, skills, and training qualify an expert" as to the composition and placement of the pavers.  In re

Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994) ("Paoli II"). Moreover, his opinions as to the design of the pool deck, placement of the tiles, and general architecture of the space are speculative and lack the hallmarks of reliability. Second, the testimony must be reliable. Id. at 742 ("[T]he expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief.") (quoting Daubert, 509 U.S. at 590, 113 S. Ct. 2786); see also Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 321 (3d Cir. 2003). References to diagrams and articles without calculations and testing relevant to the materials at issue here constitutes mere speculation, insufficient under Daubert. The record is devoid of evidence of the testing of alternative pavers or products for use on the Harrah's pool deck. As a result, Mr. Meshulam cannot opine as to whether the product pavers "w[ere] defective, that the defect existed when it left the defendant's control, and that the defect was the actual and proximate cause of the plaintiff's injury." Worrell, 799 F. Supp. 2d at 350. (citation omitted). Summary judgment is granted as to the design defect claims and the liability that flows from them.

During oral argument, Plaintiff argued that even if the design defect claims are defunct, there is a failure to warn claim against the manufacturer of the pavers. "A manufacturer has a duty to make sure that its manufactured products placed into the stream of commerce are suitably safe when used for their intended or reasonably foreseeable purposes." Brown v. U.S. Stove Co., 98 N.J. 155, 484 A.2d 1234, 1239 (N.J. 1984) (citing Soler v. Castermaster, Div. Of H.P.M. Corp., 98 N.J. 137, 484 A.2d 1225, 1229 (N.J. 1984)).

The PLA provides:

A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: (a.) deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or (b.) failed to contain adequate warnings or instructions, or (c.) was designed in a defective manner.

N.J. Stat. Ann. § 2A: 58C−2.

Therefore, a plaintiff may assert a strict liability cause of action against a product manufacturer based on an unsafe design defect, manufacturing defect, or failure to warn theory of liability. To plead a prima facie cause of action under the PLA, a plaintiff must show that the defendant manufactured the product, that a reasonably foreseeable user was injured, that the product was defective, that the defect existed when it left the defendant's control, and that the defect was the factual and proximate cause of the plaintiff's injury. Myrlak v. Port Auth. of N.Y. and N.J., 157 N.J. 84, 723 A.2d 45, 52 (N.J. 1999); Zaza v. Marquess & Nell, Inc., 144 N.J. 34, 675 A.2d 620, 627 (N.J. 1996); Jurado v. W. Gear Works, 131 N.J. 375, 619 A.2d 1312, 1317 (N.J. 1993).

In New Jersey, a plaintiff must establish the same elements to state a claim under a theory of design defect, manufacturing defect, or failure to warn; the only difference is the nature of the alleged defect. Zaza, 675 A.2d at 629; Matthews v. University Loft Co., 387 N.J. Super. 349, 903 A. 2d 1120, 1128 (N.J. Super. Ct. App. Div .2006). Here, Plaintiff's claims are predicated upon the testimony Mr. Meshulam. As a result, the evidence suffers from the same insufficiencies identified above with respect the design defect. Mr. Meshulam's lack of testing of the pavers at issue coupled with his

insufficient qualifications to opine on whether the pavers are defective or that the defect existed when it left the defendant's control. <u>Myrlak</u>, 157 N.J. 84.  Summary judgment is granted in favor of defendants Friedmutter, T.N. Ward, Thomas Company, Inc., and Westile.[6]

> B.   Plaintiffs' Claim of Negligence against Defendant Harrah's

The claims against Harrah's sound in general negligence, despite Plaintiff's attempt to frame the case under the PLA.[7] To establish a claim for common law negligence,

> [A] plaintiff must prove tortious conduct, injury and proximate cause. "Proximate cause" has been defined as "any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred." The burden of proof rests upon the plaintiff to prove a causal relationship by a preponderance of the evidence. Thus, a plaintiff must show that a defendant's conduct constituted a cause-in-fact of his injuries.

<u>Dawson v. Bunker Hill Plaza Associates</u>, 673 A.2d 847, 853 (N.J. Super. App. Div. 1996) (citations omitted).

Although, generally, "a possessor of land is not liable to his invitees or physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them," this limitation does not apply if the "possessor should anticipate the harm despite such knowledge or obviousness."  <u>La Russa v. Four Points at Sheraton</u>

---

[6] Summary judgment is also granted in favor of Associated Indemnity Insurance Company because the claims against it by T.N. Ward are derivative.

[7] Summary judgment is granted as to the product liability claims against Harrah's for the same reasons set forth as to the other defendants.  In addition, Harrah's is not a proper products liability defendant because it is not a manufacturer or seller of the pavers pursuant to N.J. Stat. Ann. § 2A: 58C–2.

Hotel, 821 A.2d 1168, 1172-73 (N.J. Super. Ct. App. Div. 2003) (quoting Restatement (Second) of Torts § 343A(1) (1965)).  Comment f. to Section 343A of the Restatement summarizes this principle: There are, however, cases in which the possessor of land can and should anticipate that the dangerous condition will cause physical harm to the invitee notwithstanding its known or obvious danger.  In such cases, the possessor is not relieved of the duty of reasonable care which he owes to the invitee for his protection. This duty may require him to warn the invitee, or to take other reasonable steps to protect him, against the known or obvious condition or activity, if the possessor has reason to expect that the invitee will nevertheless suffer physical harm. Restatement (Second) of Torts § 343A, cmt. f. (1965) (emphasis added).

Although Harrah's has a number of warnings promulgated near the pool area, there are no warnings related to the potential heat of the sun deck.  See Vitale Cert., Ex. G. Likewise, there are no signs directing users of the sundeck to wear footwear. According to Harrah's head of general maintenance, there are no signs warning patrons to wear footwear on the sun deck at Harrah's.  Heide Dep., Ex. Q., 32:8-15; 32:15-19.  However, signs requiring footwear exist for the use of the indoor pool area. Id.

There are genuine issues of material fact related to whether Harrah's exercised reasonable care for its patron's use of the sun deck.  Although Mr. Meshulam's opinion that the pavers used on Harrah's pool deck were not reasonably fit, suitable, or safe for their intended purpose cannot sustain a claim under the PLA, his observation and thermographic readings of the pool deck measured the heat of the pavers on a day with allegedly similar conditions to those allegedly present during Mr. Thompson's stay.  In

this regard, Mr. Meshulam is qualified to take the measurement of heat through thermographic readings and opine as to the nature of his findings. Specifically, Mr. Meshulam's report states that "Plaintiff was seriously burned through contact with extremely hot pool deck pavers, which reached 137°F, or even hotter as the afternoon progressed." See Meshulam Report, Ex. G. Although Meshulam cannot definitively state that the pavers were the cause of Howard Thompson's burns, there are other facts in the record that create a genuine issue of material fact related to whether the hot pavers are connected to Thompson's injury.

Defendant's own Medical Expert, Dr. Michael Downey DPM, opines that a temperature of 110 degrees would be sufficient to create a third-degree burn.  Vitale Cert., Ex. M.  Plaintiff's own medical records also demonstrate that he sustained a third degree burn on his foot in close proximity to his time at Harrah's.  In this regard, any dispute about the temperature of the pavers is immaterial because Harrah's agrees the temperature as measured was greater than the 110 degrees its own expert opines could cause a third degree burn.

Because the temperature of some of the pavers on the sundeck were— and could be—hot enough to burn Plaintiff's feet, there are questions of fact related to whether Harrah's knew or should have known of the potentially dangerous condition on the sundeck.  It is not unreasonable to think that some patrons will utilize the sundeck without footwear.  While the fact that Harrah's did not have any complaints filed with management related to the temperature of the sundeck may inform an analysis about whether Harrah's knew that the deck was dangerous, it is not dispositive of the question of whether Harrah's should have known.  Harrah's has team members who

rove the grounds looking for dangerous conditions.  The temperature of the deck is knowable and there are questions of facts as to whether Harrah's "should [have] anticipate[d] the harm despite such knowledge or obviousness."  La Russa, 821 A.2d at 1172-73. Summary judgment is denied as to the negligence claim against Harrah's.

III.    **Conclusion**

For the reasons set forth above and those stated on the record during the hearing on September 26, 2017, summary judgment is granted in favor of Associated Indemnity Insurance Company, Thomas Company, Inc., Oldcastle, Inc., T.N. Ward Company, and Friedmutter Group, LLC.  Summary judgment is granted as to the claims under the PLA in favor of Harrah's Atlantic City Operating Company.  Summary judgment is denied as to the claims of negligence against Harrah's Atlantic City Operating Company. Summary judgment is denied as to Deborah Thompson's claim of loss of consortium.

An appropriate Order shall issue.

Dated: March 29, 2018

s/ Joseph H. Rodriguez
Hon. Joseph H. Rodriguez,
UNITED STATES DISTRICT JUDGE